1  Benjamin Heikali (SBN 307466)
   **FARUQI & FARUQI, LLP**
2  10866 Wilshire Boulevard, Suite 1470
   Los Angeles, CA 90024
3  Telephone: (424) 256-2884
   Facsimile: (424) 256-2885
4  E-mail:  bheikali@faruqilaw.com

5  [Additional Counsel on Signature Page]

6  *Attorney for Plaintiff*

7
              **IN THE UNITED STATES DISTRICT COURT**
8              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9  DAVID ROTHMAN, Individually and on          )
   Behalf of All Others Similarly Situated,    )
10                                             )
                                               )
11             Plaintiff,                      )
                                               )  Case No. 3:19-cv-07066
               v.                              )
12                                             )  **CLASS ACTION COMPLAINT FOR**
   PIVOTAL SOFTWARE, INC., PAUL A.             )  **VIOLATIONS OF SECTIONS 14(a) AND**
13 MARITZ, ROBERT MEE, MICHAEL S.              )  **20(a) OF THE SECURITIES**
   DELL, WILLIAM D. GREEN, ZANE C.             )  **EXCHANGE ACT OF 1934**
14 ROWE, EGON PIERRE DURBAN,                   )
   MADELYN JOSEPH LANKTON, and                 )  **JURY TRIAL DEMANDED**
15 MARCY S. KLEVORN,                           )
                                               )
16             Defendants.                     )

17

18

19

20

21

22

23

24

25

26

27

28 **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
   **THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff David Rothman ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Pivotal Software, Inc. ("Pivotal" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Pivotal, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Pivotal and VMware, Inc. ("VMware").

2.      On August 22, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's Class A shareholders stand to receive $15.00 in cash for each share they own and the Company's Class B shareholders stand to receive 0.0550 of a share of VMware Class B common stock for each share they own.

3.      On October 10, 2019, in order to convince Pivotal shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is

- 1 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Pivotal shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Pivotal's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Pivotal shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Pivotal maintains its principal executive offices in this District.

## **PARTIES**

11.     Plaintiff is, and at all relevant times has been, a holder of Pivotal common stock.

12.     Defendant Pivotal is incorporated in Delaware and maintains its principal executive offices at 875 Howard Street, Fifth Floor, San Francisco, California 94103.  The Company's common stock trades on the NYSE under the ticker symbol "PVTL."

13.     Individual Defendant Paul A. Maritz is Pivotal's Chairman and has been a director of Pivotal since August 2015.

14.     Individual Defendant Robert Mee is Pivotal's Chief Executive Officer and Co-Founder and has been a director of Pivotal since August 2015.

15.     Individual Defendant Michael S. Dell has been a director of Pivotal since September 2016.

16.     Individual Defendant William D. Green has been a director of Pivotal since August 2015.

17.     Individual Defendant Zane C. Rowe has been a director of Pivotal at all relevant times.

18.     Individual Defendant Egon Pierre Durban has been a director of Pivotal at all relevant times.

19.     Individual Defendant Madelyn Joseph Lankton has been a director of Pivotal since October 2018.

20.     Individual Defendant Marcy S. Klevorn has been a director of Pivotal since May

- 3 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  2016.

2  21.  The Individual Defendants referred to in paragraphs 13-20 are collectively

3  referred to herein as the "Individual Defendants" and/or the "Board."

4  **CLASS ACTION ALLEGATIONS**

5  22.  Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of

6  himself and the other public Class A shareholders of Pivotal (the "Class").  Excluded from the

7  Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or

8  affiliated with any Defendant.

9  23.  This action is properly maintainable as a class action because:

10  a.  The Class is so numerous that joinder of all members is impracticable.  As

11  of August 30, 2019, there were approximately 100,000,000 shares of Pivotal common

12  stock outstanding, held by hundreds of individuals and entities scattered throughout the

13  country.  The actual number of public shareholders of Pivotal will be ascertained through

14  discovery;

15  b.  There are questions of law and fact that are common to the Class that

16  predominate over any questions affecting only individual members, including the

17  following:

18  i)  whether Defendants disclosed material information that includes

19  non-GAAP financial measures without providing a reconciliation

20  of the same non-GAAP financial measures to their most directly

21  comparable GAAP equivalent in violation of Section 14(a) of the

22  Exchange Act;

23  ii)  whether Defendants have misrepresented or omitted material

24  information concerning the Proposed Transaction in the Proxy in

25  violation of Section 14(a) of the Exchange Act;

26

27  - 4 -

28  **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

iii)  whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Proposed Transaction**

24.  Pivotal provides a cloud-native platform that accelerates and streamlines software development by reducing the complexity of building, deploying and operating new cloud-native application and modernizing legacy applications. The Company markets and sells its platforms through its sales force and ecosystem partners, leveraging mutually beneficial commercial and

- 5 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

go to market relationships with Dell Technologies and VMware to win new customers. Pivotal also works with large public cloud providers to bring its customers' workloads to cloud infrastructure.

25.    On August 22, 2019, Pivotal and VMware issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> PALO ALTO, Calif., Aug. 22, 2019 (GLOBE NEWSWIRE) -- VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Pivotal Software, Inc. (NYSE: PVTL), a leading cloud-native platform provider, today announced that the companies have entered into a definitive agreement under which VMware will acquire Pivotal for a blended price per share of $11.71, comprised of $15 per share in cash to Class A stockholders, and the exchange of shares of VMware's Class B common stock for shares of Pivotal Class B common stock held by Dell Technologies, at an exchange ratio of 0.0550 shares of VMware Class B stock for each share of Pivotal Class B stock.  In total, the merger consideration represents an enterprise value for Pivotal of $2.7 billion. The Board of Directors of each of VMware and Pivotal have approved this transaction, following the recommendations of special committees composed of independent directors of each company. Following the close of the transaction, VMware will be positioned to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for modern applications.
>
> Pivotal is a technology leader that is transforming the way the world's largest companies build and run software applications. For the last six years, Pivotal has been at the leading-edge of modern software development, helping organizations transform how they build and run their most important applications. Pivotal offers a powerful set of assets including a leading developer-centric platform, tools and services that accelerate modern app development. Additionally, Pivotal is a major contributor to the Spring developer framework, which sees more than 75 million downloads per month. The company is fully embracing Kubernetes with the recent launch of Pivotal Spring Runtime for Kubernetes and the upcoming Pivotal Application Service for Kubernetes.
>
> VMware and Pivotal share a long history of collaboration and joint innovation, reflected in the co-development and launch of VMware Pivotal Container Service (PKS) in February of 2018. VMware has increased its Kubernetes-related investments over the past year with the acquisition of Heptio, and the Kubernetes founders, to become one of the top three contributors to Kubernetes. The combination of Pivotal's developer experience and assets with VMware's IT expertise and infrastructure will help deliver a comprehensive portfolio of products, tools and services necessary to build, run and manage modern applications on Kubernetes infrastructure with velocity and efficiency.

- 6 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

"Kubernetes is emerging as the de facto standard for multi-cloud modern apps. We are excited to combine Pivotal's development platform, tools and services with VMware's infrastructure capabilities to deliver a comprehensive Kubernetes portfolio to build, run and manage modern applications," said Pat Gelsinger, CEO of VMware. "Importantly, adding Pivotal to our platform, accelerates our broader Any Cloud, Any App, Any Device vision and reinforces our leadership position in modern multi-cloud IT infrastructure."

"The time is ideal to join forces with VMware, an industry leader who shares our commitment to open source community contributions and our focus on adding developer value on top of Kubernetes," said Rob Mee, CEO, Pivotal. "VMware has a proven track record of helping organizations run and manage consistent infrastructure in support of mission critical applications, and our two companies have already built a strong foundation on our successful VMware PKS collaboration. We look forward to continuing our work with VMware to provide even more value to customers building modern applications."

"The VMware Board of Directors is committed to creating value for all stockholders," said Karen Dykstra, Chairperson of the Special Committee of VMware's Board of Directors. "After a thorough and independent evaluation with its advisors, and working closely with the VMware management team, the Special Committee recommended the Board approve this transaction with Pivotal given its strong strategic and long-term value to the company and its customers."

**Details Regarding the Transaction**

Under the terms of the transaction, Pivotal's Class A common stockholders will receive $15.00 per share cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies, will receive approximately 7.2 million shares of VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. This transaction, in aggregate, results in an expected net cash payout for VMware of $0.8 billion. The impact of equity issued to Dell Technologies would increase its ownership stake in VMware by approximately 0.34 percentage points to 81.09% based on the shares currently outstanding. VMware currently holds 15 percent of fully-diluted outstanding shares of Pivotal. The transaction is expected to be funded through cash on the balance sheet, accessing short-term borrowing capacity, and approximately 7.2 million shares of VMware Class B common stock to Dell. Closing of the transaction is subject to customary closing conditions including the approval of the merger agreement by the holders of at least a majority of the outstanding shares of Pivotal common stock not owned by VMware or Dell Technologies or their affiliates (a "majority-of-the-minority" vote) and is expected in the second half of VMware's fiscal year 2020, which ends January 31, 2020.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Advisors**

J.P. Morgan Securities LLC served as financial advisor and Wilson Sonsini Goodrich & Rosati served as legal counsel to VMware.  Lazard served as financial advisor and Gibson, Dunn & Crutcher LLP served as legal counsel to the Special Committee of the VMware Board of Directors.  Davis Polk & Wardwell LLP served as legal counsel to Pivotal.  Morgan Stanley & Co. LLC served as financial advisor and Latham & Watkins, LLP served as legal counsel to the Special Committee of the Pivotal Board of Directors.

**Investor's Conference Call**

The company will host a previously-announced conference call today at 1:30 p.m. PT/ 4:30 p.m. ET to review financial results, discuss the proposed transaction, and business outlook. A live web broadcast of the event will be available on the VMware investor relations website at **http://ir.vmware.com**. Slides will accompany the web broadcast. The replay of the webcast and slides will be available on the website for two months. In addition, six quarters of historical data for unearned revenue will also be made available at **http://ir.vmware.com** in conjunction with the conference call.

Pivotal will report financial results for the second quarter fiscal year 2020, which ended on August 2, 2019, on Wednesday, September 4, 2019 following the close of market. Given today's announcement, Pivotal will not be hosting a conference call to discuss the financial results.

**Additional Resources**

- **Learn more about the news here**
- Read Pivotal's **blog post** on the news

**About Pivotal**

Pivotal combines our cloud-native platform, developer tools, and unique methodology to help the world's largest companies transform the way they build and run their most important software applications. Our technology is used by Global 2000 companies to achieve strategic advantages in software development and IT operations. Learn more at **pivotal.io**.

**About VMware**

VMware software powers the world's complex digital infrastructure. The company's cloud, networking and security, and digital workspace offerings provide a dynamic and efficient digital foundation to customers globally, aided by an extensive ecosystem of partners. Headquartered in Palo Alto, California, VMware is committed to being a force for good, from its breakthrough

- 8 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

innovations to its global impact. For more information, please
visit **https://www.vmware.com/company.html**.

26.     Pivotal is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

27.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

**II.     The Materially Incomplete and Misleading Proxy**

28.     On October 10, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

***The Materiality of Financial Projections***

29.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that Pivotal's management prepared multiple

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

1  sets of financial projections and provided a subset of them to Morgan Stanley and VMware.

2  Proxy at 78-79.

3      30.    When soliciting proxies from shareholders, a company must furnish the

4  information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule

5  14A sets forth the information a company must disclose when soliciting proxies regarding

6  mergers and acquisitions.  In regard to financial information, companies are required to disclose

7  "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of

8  Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

9      31.    Under Item 10 of Regulation S-K, companies are encouraged to disclose

10  "management's projections of future economic performance that have a reasonable basis and are

11  presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the

12  usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to

13  assure that the choice of items projected is not susceptible of misleading inferences through

14  selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

15     32.    In order to facilitate investor understanding of the Company's financial

16  projections, the SEC provides companies with certain factors "to be considered in formulating

17  and disclosing such projections[,]" including:

18     (i) When management chooses to include its projections in a Commission filing,
    *the disclosures accompanying the projections should facilitate investor*
19     *understanding of the basis for and limitations of projections.* In this regard
    investors should be cautioned against attributing undue certainty to management's
20     assessment, and the Commission believes that investors would be aided by a
    statement indicating management's intention regarding the furnishing of updated
21     projections. *The Commission also believes that investor understanding would be*
    *enhanced by disclosure of the assumptions which in management's opinion are*
22     *most significant to the projections or are the key factors upon which the financial*
    *results of the enterprise depend and encourages disclosure of assumptions in a*
23     *manner that will provide a framework for analysis of the projection.*

24     (ii) Management also should consider whether disclosure of the accuracy or
    inaccuracy of previous projections would provide investors with important
25     insights into the limitations of projections. In this regard, *consideration should be*
    *given to presenting the projections in a format that will facilitate subsequent*
26     *analysis of the reasons for differences between actual and forecast results.* An
    important benefit may arise from the systematic analysis of variances between

27                                    - 10 -

28  **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
    **THE SECURITIES EXCHANGE ACT OF 1934**

1    projected and actual results on a continuing basis, since such disclosure may
2    highlight for investors the most significant risk and profit-sensitive areas in a
     business operation.

3    17 C.F.R. § 229.10(b)(3) (emphasis added).

4        33.     Here, Pivotal's shareholders would clearly find complete and non-misleading

5    financial projections material in deciding how to vote, considering that in making its

6    recommendation that shareholders vote in favor of the Proposed Transaction, one of the Board's

7    stated reasons for recommending the merger is "the Pivotal Special Committee's analysis and

8    discussions with Pivotal management considering the current and historical financial condition,

9    results of operations, business and prospects of Pivotal, as well as Pivotal's financial plan and

10   prospects and risks if Pivotal were to remain independent and the potential impact of those

11   factors on the trading price of the Class A common stock."  Proxy 38.

12       34.     As discussed further below, the non-GAAP financial projections here do not

13   provide Pivotal's shareholders with a materially complete understanding of the assumptions and

14   key factors considered in developing financial projections, which assumptions, factors and other

15   inputs the Board reviewed.

16       ***The Financial Projections Relied on by the Board***

17       35.     The Proxy discloses that the Company's management prepared projections for the

18   fiscal year ending January 31, 2020, a high-level outlook for the fiscal years ending January 29,

19   2021 and January 28, 2022, and a sensitivity analysis of the three years of financial projections.

20   *Id.* at 78.  The projections and sensitivity analysis were revised following the end of Pivotal's

21   first fiscal quarter ended May 2, 2019, and Morgan Stanley extrapolated the revised projections

22   through fiscal year 2029. *Id.* at 78-79. The Board and Morgan Stanley reviewed the revised and

23   extrapolated projections, and VMware reviewed the initial and revised projections. *Id.* at 79.

24       36.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-

25   GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2023 for

26   (1) EBIT and for 2020 through 2029 for (1) EBITDA, and (2) unlevered free cash flow, but fails

27                                          - 11 -

28   **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
     **THE SECURITIES EXCHANGE ACT OF 1934**

to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 81-82.

37.    The Proxy does not define EBIT and fails to reconcile EBIT to its most comparable GAAP measure nor disclose the line items used to calculate EBIT, rendering the Proxy materially false and/or misleading. *Id.*

38.    The Proxy does not define EBITDA and fails to reconcile EBITDA to its most comparable GAAP measure nor disclose the line items used to calculate EBITDA, rendering the Proxy materially false and/or misleading. *Id.*

39.    The Proxy does not define Unlevered Free Cash Flow ("UFCF") and fails to reconcile UFCF to its most comparable GAAP measure, rendering the Proxy materially false and/or misleading. *Id.*

40.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon. It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.    The financial projections disclosed on pages 81-82 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G, as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

- 12 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

42.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

43.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

44.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

frequent use by publicly traded companies of unique company-specific non-GAAP financial

measures (as Pivotal included in the Proxy here) implicates the centerpiece of the SEC's

disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

46.    The SEC has required compliance with Regulation G, including reconciliation

requirements, in other merger transactions. *Compare Youku Tudou Inc., et al.*, Letter to SEC 5

(Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP

financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff

Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial

information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-

A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Letter

---

*Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

- 14 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

47.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

48.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading, as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "[non-GAAP] financial measures should not be considered in isolation from, or as a substitute

---

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/ filename1.htm.  *See also Actel Corp.*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/ filename1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflects the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

- 15 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

for, financial information presented in accordance with GAAP. Pivotal's or Morgan Stanley's calculations of these financial measures may differ from others in its industry and are not necessarily comparable with information presented under similar captions used by other companies." Proxy 80.

50.    Moreover, the Proxy fails to even define any of the non-GAAP measures. This is problematic because non-GAAP terms do not have standardized definitions and a company can choose to define the metrics in any way they choose.  As a reconciliation and the line items were not provided for the non-GAAP metrics, it is unclear how the Company has actually defined them and whether or not non-traditional adjustments were made.

51.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

52.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 81-82, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

53.    The summary of the valuation methodologies utilized by Morgan Stanley including the utilization of certain of the non-GAAP financial projections described above by Morgan Stanley, in connection with its valuation analyses, (*id.* at 44) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a Proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

54.    With respect to Morgan Stanley's prior relationship with VMware, Dell and Dell-related companies, the Proxy fails to disclose the nature and timing of the past services Morgan Stanley has provided. *Id.* at 52.

- 16 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

55.     With respect to Morgan Stanley's *Public Trading Comparables Analysis*, the Proxy fails to disclose the individual aggregate value to estimated calendar year 2019 and 2020 revenue multiples calculated for each comparable company. *Id.* at 46

56.     With respect to Morgan Stanley's *Discounted Equity Value Analysis*, the Proxy fails to disclose the Street Case estimated revenue for fiscal years 2022 through 2024, Pivotal's net debt at the end of each fiscal year from 2022 through 2024, the inputs and assumptions that went into the selection of a 10% cost of equity, nor the fully diluted shares outstanding. *Id.* at 47.

57.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy states that Morgan Stanley calculated estimates of the Company's UFCF and a range of terminal values in the year 2028 by applying perpetuity growth rates ranging from 2.5% to 3.5% to the estimated UFCF after August 22, 2019, using both Street Case estimates and management projections. *Id.* at 47-48. Morgan Stanley also calculated the amount of net operating loss carryforwards and tax credit carryforwards that the Company's management estimated could be utilized for the period from fiscal year 2020 through fiscal year 2029. *Id.* Morgan Stanley then discounted to present values as of August 22, 2019, estimates of unlevered free cash flow, the range of illustrative terminal values, and the net operating loss carryforwards and tax credit carryforwards. *Id.* Morgan Stanley used a discount rate ranging from 9% to 11% reflecting the estimate of the Company's weighted average cost of capital.  *Id.*  Morgan Stanley then subtracted the Company's net debt and the discounted net operating loss carryforwards and tax credit carryforwards and divided by the number of fully diluted outstanding shares to derive a range of illustrative equity values. *Id.*

58.     The Proxy does not disclose the inputs nor the values Morgan Stanley calculated for the Street Case UFCF, the range of terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, the inputs and assumptions that went into selecting the perpetuity growth rate range, the Company's net debt, estimated net

operating loss carryforwards and tax credit carryforwards, nor the number of fully diluted shares outstanding.

59.     Since information was omitted, shareholders are unable to discern the veracity of Morgan Stanley's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare Morgan Stanley's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Morgan Stanley's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

60.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (Aug. 2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

61.     The failure to disclose the inputs for the Company's cost of equity and weighted average cost of capital is particularly misleading because of the values Morgan Stanley selected. For the Company's cost of equity and weighted average cost of capital, Morgan Stanley selected 10% and a range of 9% to 11% respectively.  Proxy 47-48.

62.     Morgan Stanley selected a cost of equity in the middle of the weighted average cost of capital range.  This is problematic because a company's weighted average cost of capital

- 18 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

should be lower than its cost of equity as the cost of debt (a factor in the calculation of the weighted average cost of capital) is lower than its cost of equity. Therefore, unless a company is 100% equity financed (where the weighted average cost of capital would be equal to the cost of equity), the weighted average cost of capital should be lower than the cost of equity. Morgan Stanley's selected weighted average cost of capital ranges suggest that there are scenarios where the Company's cost of debt is larger than the cost of equity. As the discount rate is one of the most important factors in any valuation analysis, shareholders need to know how Morgan Stanley has calculated the discount rates for the respective analyses and why the weighted average cost of capital range for the Company contains discount rates higher than the cost of equity, as this would be a very uncommon scenario.

63.     Therefore, in order for Pivotal shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

64.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Pivotal shareholders.

65.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

66.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

**COUNT I**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

69.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

70.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

71.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed

- 20 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

1    Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e., the

2    difference between the value they will receive as a result of the Proposed Transaction and the

3    true value of their shares prior to the merger) in an amount to be determined at trial and are

4    entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

5                                                **COUNT II**

6    **(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9
     Promulgated Thereunder)**

7            72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

8    herein.

9            73.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

10   statements that contain "any statement which, at the time and in the light of the circumstances

11   under which it is made, is false or misleading with respect to any material fact, or which omits to

12   state any material fact necessary in order to make the statements therein not false or

13   misleading[.]" 17 C.F.R. § 240.14a-9(a).

14           74.     Regulation G similarly prohibits the solicitation of shareholder votes by

15   "mak[ing] public a non-GAAP financial measure that, taken together with the information

16   accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a*

17   *material fact necessary in order to make the presentation of the non-GAAP financial measure*

18   *. . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

19           75.     Defendants have issued the Proxy with the intention of soliciting shareholder

20   support for the Proposed Transaction. Each of the Defendants reviewed and authorized the

21   dissemination of the Proxy, which fails to provide critical information regarding, amongst other

22   things, the financial projections for the Company.

23           76.     In so doing, Defendants made untrue statements of fact and/or omitted material

24   facts necessary to make the statements made not misleading. Each of the Individual Defendants,

25   by virtue of their roles as directors and/or officers, were aware of the omitted information but

26   failed to disclose such information, in violation of Section 14(a). The Individual Defendants

27                                                  - 21 -

28   **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
     THE SECURITIES EXCHANGE ACT OF 1934**

1   were therefore negligent, as they had reasonable grounds to believe material facts existed that

2   were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such

3   information to shareholders although they could have done so without extraordinary effort.

4         77.    The Individual Defendants knew or were negligent in not knowing that the Proxy

5   is materially misleading and omits material facts that are necessary to render it not misleading.

6   The Individual Defendants undoubtedly reviewed and relied upon the omitted information

7   identified above in connection with their decision to approve and recommend the Proposed

8   Transaction.

9         78.    The Individual Defendants knew or were negligent in not knowing that the

10  material information identified above has been omitted from the Proxy, rendering the sections of

11  the Proxy identified above to be materially incomplete and misleading.

12        79.    The Individual Defendants were, at the very least, negligent in preparing and

13  reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing

14  materially false or misleading statements or omitting a material fact constitutes negligence.  The

15  Individual Defendants were negligent in choosing to omit material information from the Proxy or

16  failing to notice the material omissions in the Proxy upon reviewing it, which they were required

17  to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

18  involved in the process leading up to the signing of the Merger Agreement and the preparation of

19  the Company's financial projections.

20        80.    Pivotal is also deemed negligent as a result of the Individual Defendants'

21  negligence in preparing and reviewing the Proxy.

22        81.    The misrepresentations and omissions in the Proxy are material to Plaintiff and

23  the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

24  and omissions are not corrected prior to the vote on the Proposed Transaction.

25        82.    As a direct and proximate result of the dissemination of the false and/or

26  misleading Proxy Defendants used to recommend that shareholders approve the Proposed

27

28  **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e., the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III
**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

83. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84. The Individual Defendants acted as controlling persons of Pivotal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Pivotal, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

85. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous

- 23 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

87.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

D.    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 28, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

By:  */s/ Benjamin Heikali*
Benjamin Heikali, Bar No. 307466
10866 Wilshire Blvd., Suite 1470
Los Angeles, CA 90024
Tel.: (424) 256-2884
Fax: (424) 256-2885
Email: bheikali@faruqilaw.com

*Counsel for Plaintiff*

- 25 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-07066

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, David Rothman ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Pivotal Software, Inc. ("Pivotal") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Pivotal's securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 23rd day of October, 2019.

David Rothman

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 01/22/19 | 500 |
|  |  |  |
|  |  |  |